OPINION OF THE COURT
 

 Chief Judge Kaye.
 

 These consolidated appeals involve the validity of New York City’s proposed sale of its Water System to the City Water Board, financed by bonds to be issued by the City Water Finance Authority. Although several complex issues are raised, the threshold question — which is dispositive — is one of straightforward statutory interpretation: does the New York City Municipal Water Finance Authority Act permit the Authority to issue bonds to finance this particular purchase? Like the courts below, we conclude that the statute does not permit the proposed transaction and it therefore cannot be consummated.
 

 The Water System encompasses both water and sewer systems. The water system alone includes 19 upstate reservoirs providing, on average, 1.5 billion gallons of water per day to approximately 8 million residents of New York City and neighboring Westchester County; more than 340 miles of aqueducts and tunnels; approximately 5,800 miles of distribution mains and pipes; and various treatment and pumping facilities. The sewer system includes 14 sewage treatment plants, handling a daily average of 1.5 billion gallons of sewage flow, as well as more than 6,300 miles of pipes and associated facilities. The City’s Department of Environmental Protection (DEP) is responsible for the operation, maintenance and improvement of the Water System.
 

 
 *34
 
 For more than 150 years, the City has owned the Water System. The DEP fixed water rates, subject to the approval of the Board of Estimate; sewer rates were set by local law as a percentage of water rates; and the City Department of Finance billed and collected these charges. Before 1984, the City raised money for capital improvements to the Water System through general obligation bonds.
 

 In 1984, in the aftermath of the City’s financial crisis, the Legislature enacted the New York City Municipal Water Finance Authority Act (L 1984, chs 513-515). As the Legislature declared, alternative financing methods must be available to the City in order to insure the availability of "the capital necessary to maintain the city’s water and sewer systems in an adequate condition so that they continue to provide vital water and sewer services to the public” (L 1984, ch 513, § 1 [reprinted in McKinney’s Cons Laws of NY, Public Authorities Law § 1045-a, Book 42, Legislative Findings and Declaration of Purpose, at 601]).
 

 To this end, the Act created two entities, the New York City Municipal Water Finance Authority and the New York City Water Board (Public Authorities Law §§ 1045-c, 1045-f, 1046). The central function of the Authority is to provide revenue bond financing for improvements to the City’s water and sewer infrastructure (Public Authorities Law §§ 1045-c, 1045-d [3], [12], [14]; § 1045-o [1]). The Board’s main function is to provide sufficient funds — through fixing and collecting water and sewer charges and other revenues — for the City to operate and maintain the Water System and for the Authority to service water and sewer debt (Public Authorities Law § 1045-g [4]; § 1045-j [1]).
 

 The Act also permits the City, the Board and the Authority to enter into agreements related to the Water System. The Mayor can, for example, "enter into an agreement with the water board for the transfer to the water board, for use in the exercise of its corporate powers and purposes, the sewerage system or water system, or both, of the city as the same shall be owned by the city” (Public Authorities Law § 1045-h [1]). The Board, moreover, can take title to the Water System and enter into contracts necessary to do so (Public Authorities Law §§ 1045-g [5], [9]). The City, the Board and the Authority additionally "may enter into agreements for the purpose of providing for the construction and financing of a water project” (Public Authorities Law § 1045-i [1]).
 

 
 *35
 
 Following adoption of the Act, on July 1,1985 the City leased the Water System to the Board for 40 years or until all bonds of the Authority are paid in full, whichever is later. Under the lease, the DEP retains responsibility for system administration, operation, maintenance and capital construction, as required by the Act, and is to be reimbursed by the Board for its costs (Public Authorities Law § 1045-i [2] [vii]; § 1045-j [1] [ii], [in]). Section 8.2 of the lease also provides that the Board must pay the City an annual rental payment requested by the City which will not exceed the greater of debt service on outstanding City water and sewer bonds or 15% of Authority debt service.
 

 In early 1995, confronted with a budget deficit, appellant Mayor Rudolph W. Giuliani proposed sale of the Water System to the Board — in effect, a buyout of the lease — for $2.3 billion payable over four years, with the Authority to issue bonds in that amount to finance the purchase. This figure represented the maximum estimated payments that the Board would pay under the remaining years of the lease, discounted to present value. Of the proceeds, $1.3 billion would be applied to retiring the City’s pre-1984 water and sewer debt. The remaining $1 billion would be spent on non-Water System-related capital projects in the City.
 

 On June 14,1995, the City Council approved the 1996 budget, incorporating the proposed allocation of proceeds, including some $200 million for Board of Education capital projects and $200 million for other City capital projects. Shortly thereafter, respondent Comptroller Alan G. Hevesi announced that because the proposed sale was "not in the best interests of the people of our city and their future well-being,” he would veto the resolution authorizing issuance of the bonds. On November 18, 1995, the City, joined by the Authority and the Board, sought both a declaratory judgment that the Comptroller had acted in excess of his powers and an injunction directing the Comptroller to make the arrangements necessary for the bond sale.
 

 Meanwhile, the City had been considering the possible environmental effects of the proposed sale. As lead agency under the State Environmental Quality Review Act (SEQRA), the Mayor prepared an Environmental Assessment Statement which recognized that the proposed sale was a "Type I” transaction but nevertheless concluded that no Environmental Impact Statement was required. As a result, on December 6, 1995, the Mayor’s office issued a negative declaration. Five
 
 *36
 
 days later, the National Resources Defense Council, Inc. (NRDC), joined by environmental and community organizations, commenced an action to enjoin the Board from purchasing the Water System, to enjoin the Authority from issuing bonds to finance the purchase, and to compel the municipal defendants to comply with land use and environmental review laws.
 

 In both actions the City sought summary judgment. Supreme Court denied the City’s motion and granted the Comptroller summary judgment dismissing the complaint on the ground that the bond issuance was not authorized by the governing statute. The court granted the City summary judgment in the second action, ruling that the NRDC plaintiffs lacked standing to bring two of their causes of action and that their remaining claims were either moot or meritless. In each action, the Appellate Division modified (228 AD2d 348). While holding that the Act did not authorize the proposed financing scheme the Appellate Division added that if, as planned, sale proceeds were used by the City for purposes unrelated to the Water System, the water user fees charged by the Board would constitute an unconstitutional tax, especially on ratepayers outside the City. The court, moreover, held that the NRDC plaintiffs lacked standing to challenge the bond issuance because they could not demonstrate injury-in-fact and that they were entitled to relief on their SEQRA/CEQR claims.
 

 Concluding that the proposed financing plan is not authorized by the controlling statute, we now affirm dismissal of the City’s complaint on that ground alone, which renders it unnecessary for us to consider any of the remaining issues.
 

 Analysis
 

 The threshold question before us, as it was below, is whether the Act sanctions the proposed bond issuance. To answer this question, we look to the statutory language, which allows the Authority to issue bonds "in such principal amounts as it may determine to be necessary to pay the cost of any water project or water projects, or for any other corporate purposes” (Public Authorities Law §
 
 1045-o
 
 [1]). Thus, use of the Authority’s debt power is permissible only if the purchase of the Water System on the terms proposed is of a "water project” or furthers "other corporate purposes” of the Authority. We conclude that the proposed transaction falls into neither category.
 

 The Water System is not a "water project.” The defined terms "water system” and "sewerage system,” taken together,
 
 *37
 
 mean all of the water and sewer assets owned or possessed by the City or the Board (Public Authorities Law § 1045-b [14], [21]). The term "water project,” however, is narrower, meaning "any sewerage facility, water facility or water and sewerage facility, as the case may be, including the planning, development, financing or construction thereof’ (Public Authorities Law § 1045-b [20]). Planning, development, financing or construction of water or sewer "facilities” — meaning any "plants, structures and other real and personal property” (Public Authorities Law § 1045-b [13], [19]) — might therefore include acquisition of a private water company, but not acquisition of the whole Water System. Plainly then, statutory authorization to issue bonds for payment of the cost of a "water project” contemplates something less than financing the purchase of the entire "system.”
 

 That the term "water project” does not include the transfer of the entire Water System is further underscored by provisions of the Act differentiating between the two. Section 1045-g (6) of the Public Authorities Law distinguishes between "providing] a means whereby the authority shall finance the cost of constructing
 
 water
 
 projects,” and providing a means whereby "the water board may agree to assume title to the
 
 water or sewerage
 
 system” (emphasis added). At another point, section 1045-i (2) (vi) states that the water project agreement "may provide for the transfer by the city to the water board * * * of ownership of the sewerage system or water system, or both, as the case may be,
 
 of which such project will form a part by the
 
 city” (emphasis added). Belatedly, section 1045-i (2) (vii) mandates that the water project agreement "shall provide for the construction and completion of such water project by the city and for the operation, maintenance and repair thereof
 
 as an integrated part of the system of which such water project forms a
 
 part” (emphasis added).
 

 Thus, we conclude that, in permitting the Authority to issue bonds to cover necessary costs, the Legislature contemplated that a "water project” would be a component of the Water System, not the Water System itself.
 

 Nor is issuance of bonds to fund this particular transaction among the "other corporate purposes” of the Authority.
 
 [1]
 
 Nowhere is there a hint that, the Authority’s purposes include the raising of revenues for unrelated City capital projects— quite the reverse is true.
 

 
 *38
 
 In section (1), the Legislature made it clear that the Act was adopted to facilitate the financing of needed expenditures for the maintenance and improvement of the Water System. The Legislature first acknowledged that:
 

 "[T]he maintenance of water supply systems and the development of new sources of supply in and for the city of New York, and the collection, treatment and disposal of sewage in a safe, sanitary and efficient manner are required to enhance the achievement of statewide goals of protecting public health, promoting conservation of scarce natural resources and stimulating economic growth.” (L 1984, ch 513, § 1 [reprinted in McKinney’s Cons Laws of NY,
 
 op. cit.,
 
 at 601].)
 

 After recognizing that the use of other methods of financing besides general obligation borrowing, which was expanding rapidly at the time, would benefit the City’s over-all capital program, the Legislature stated that one of these alternatives— issuance of bonds secured by local water and sewer user fees and other revenues — should be used to address the capital needs of the water and sewer system
 
 (id.,
 
 at 601-602). Finally, the Legislature noted that a new "single-purpose” entity — the Authority — was being created "to assist such city
 
 in financing water and sewer system improvements
 
 through the issuance of such securities”
 
 (id.,
 
 at 602 [emphasis added]).
 

 The legislative history is replete with similar expressions of intention. The Governor in his Approval Memorandum, for example, emphasized that the City’s "need for water and sewer capital improvements * * * is manifest” and that the legislation would "assure that the City’s water supply and sewer system receive the capital financing they require at the least cost to the taxpayers” (Governor’s Approval Mem, Bill Jacket, L 1984, ch 513 [reprinted in 1984 McKinney’s Session Laws of NY, at 3610]). Supporters of the bill urged that creation of the Authority would enable the City to complete construction of a third water tunnel, a project that had been halted because of a shortage of funds, and would allow the City to pay for other long-overdue improvements to the Water System
 
 (see, e.g.,
 
 Mem of NY State AFL-CIO, Bill Jacket, L 1984, ch 513).
 

 The Division of the Budget, in offering its recommendation for approval of the legislation, acknowledged that revenue
 
 *39
 
 bonds issued by the Authority would "assist the City in financing the construction and rehabilitation of its water and sewer system” by "enabling] the City to move forward in a timely manner with its planned one billion dollar water and sewer construction and rehabilitation program,” while "[a]t the same time, other planned City capital projects can be funded through general obligation borrowing” (Mem of Div of Budget, Bill Jacket, L 1984, ch 513). And as a final example, the Legislative Representative of the City of New York acknowledged that the decision to set up a special revenue bond financing mechanism for water and sewer projects was motivated by a concern that the general obligation bonding capacity of the City was facing so many demands that the needs of the water and sewer systems were receiving inadequate attention (Mem of Legis Rep of City of NY, Bill Jacket, L 1984, ch 513 [reprinted in 1984 McKinney’s Session Laws of NY, at 3330]).
 

 Thus, funding the City’s general capital needs was not among the "corporate purposes” of the Authority.
 
 [2]
 

 The statutory language, amply buttressed by the legislative history, supports the result reached by both the trial court and the Appellate Division: the proposed transaction is unauthorized and cannot proceed.
 

 We reach this determination giving effect to the plain meaning of the words used in the statute, and thereby implementing the intent of the Legislature, as we are obliged to do. This is precisely what the Court did in
 
 Comereski v City of Elmira
 
 when it read the words of the statute to "mean just what they say” (308 NY 248, 254), and we decline to adopt the City’s proffered new statutory interpretation standard that municipal bond arrangements must be upheld unless "patently illegal.” As is pellucidly clear in the case law, the deference exemplified by the "patently illegal” standard added in
 
 Comereski
 
 is most appropriate in reviewing challenges to municipal
 
 *40
 
 financing legislation as exceeding constitutional limitations (see,
 
 e.g., Schulz v State of New York,
 
 84 NY2d 231,
 
 cert denied
 
 513 US 1127;
 
 Hotel Dorset Co. v Trust for Cultural Resources,
 
 46 NY2d 358;
 
 Wein v State of New York,
 
 39 NY2d 136;
 
 Wein v City of New York,
 
 36 NY2d 610). The question we decide today is a different one — not whether the act of a coequal branch of government should be struck down as unconstitutional, but whether the Act permits the proposed transaction. We conclude that it does not.
 

 Accordingly, the order of the Appellate Division should be modified, with costs to respondents, by reinstating the respective judgments of Supreme Court, New York County, dismissing the complaint in each action and, as so modified, affirmed.
 

 Judges Titone, Bellacosa, Smith, Levine, Ciparick and Wesley concur.
 

 Order modified, etc.
 

 [1]
 

 . One of the "corporate purposes” of the Authority is to issue bonds to retire outstanding City water and sewer debt. We note that the legality of
 
 *38
 
 the $1.3 billion portion of the proposed transaction that would be used to retire water and sewer debt has not been challenged as unauthorized.
 

 [2]
 

 . The City argues that invalidating the proposed bond issuance here calls into question bonds issued to finance water system sales by the Cities of Albany and Buffalo. While neither of those transactions is before us, we note certain distinctions from the present case. As the record indicates, in the Albany transaction the Authority paid the City only what was required to reimburse the City for water-related debt and expenditures
 
 (see,
 
 n 1,
 
 supra).
 
 Prior to the transfer of the water system in Buffalo, the Buffalo Municipal Water Finance Authority Act was amended by the Legislature to provide that "any moneys received by the city in consideration for the transfer of such water system to the water board may be deposited in the general fund of the city and used for any lawful city purpose” (Public Authorities Law § 1048-h [2]).