OPINION OF THE COURT
 

 Wesley, J.
 

 These related appeals challenge the validity of a sublease of a hospital operated by the New York City Health and Hospitals Corporation (HHC) to a for-profit entity pursuant to the Health and Hospitals Corporation Act (Act). Although several issues are raised, the threshold question is: does the Act permit the City to sublease Coney Island Hospital and turn over its operations and service obligations to PHS New York, Inc., a private entity? Like the courts below, we conclude that the statute precludes the proposed transaction.
 

 Historical Context
 

 In 1929 New York City established a municipal Hospitals Department to provide health care to all residents who were unable to obtain care from private providers because of poverty, location or discrimination. This Department, which administered the municipal health system, operated fairly well during the Great Depression and the years preceding World War II.
 

 The decades following World War II, however, witnessed a steady decline in the municipal health system, and by the 1960s it was in chronic crisis. This crisis was born of bureaucratic sclerosis, archaic management practices, inefficiency and a shortage of funds. New York City hospitals suffered from obsolete facilities, long clinic waits and little or no primary care. The hospitals were under public attack for making second-class citizens of those New Yorkers who were dependent on them for their care
 
 (see generally,
 
 Commission on the Delivery of Personal Health Services,
 
 Comprehensive Community Health Services for New York City
 
 [Dec. 1967]).
 

 In 1969 the Legislature enacted the New York City Health and Hospitals Corporation Act, establishing HHC (McKinney’s Uncons Laws of NY § 7381
 
 et seq.
 
 [HHC Act § 1
 
 et seq.]-,
 
 L 1969, ch 1016, as amended). HHC was the perceived antidote for the ills that plagued the City’s health care system. The Act
 
 *66
 
 authorizes HHC to manage and operate the City’s municipal hospital system (McKinney’s Uncons Laws of NY § 7386 [1] [a] [HHC Act § 6 (1) (a)]). The mission of HHC is to provide efficient, comprehensive health and medical resources to protect and promote the safety and welfare of New York City residents (McKinney’s Uncons Laws of NY § 7382 [HHC Act § 2]). According to the Act, the provision of health and medical services and “the exercise by such corporation of the functions, powers and duties as hereinafter provided constitutes the performance of an essential public and governmental function” (McKinney’s Uncons Laws of NY § 7382).
 

 In conjunction with providing quality care to those in need, HHC was established to permit independent financing of municipal hospital construction and improvements and to facilitate professional management of the hospital system. It was intended to overcome the “myriad * * * complex and often deleterious constraints” which inhibited the provision of care by the City in its own operation of the municipal health system (McKinney’s Uncons Laws of NY § 7382). The Act authorized the City to lease the City-owned hospitals to HHC to fulfill its corporate purposes, “for so long as [HHC] shall be in existence” (McKinney’s Uncons Laws of NY § 7387 [1] [HHC Act § 7 (1)]). The property, plant and equipment associated with these facilities are owned by the City and leased to HHC for an annual rent of $1 in accordance with these provisions.
 

 HHC has evolved into the largest municipal hospital system in the country, handling more than 6.5 million patient visits and 230,000 admissions per year. The municipal health care system consists of 11 acute care facilities (including major teaching facilities), five certified home health care agencies, five long-term care facilities, six diagnostic and treatment centers, a network of more than 20 satellite clinics and a prepaid health plan.
 

 The Contemporary Context and Present Litigation
 

 Today New York City is experiencing a deja vu regarding the provision of health care to the needy. Although different forces are at work in the contemporary health care industry, once again spiraling costs and a shortage of funds are the hallmarks of New York City’s health care system
 
 (see,
 
 Report of State Comptroller H. Carl McCall,
 
 Challenges Facing New York City’s Public Hospital System,
 
 at 4-99 [Aug. 5, 1998]). The current administration, like its predecessor 30 years ago, began considering various ways to revive and redefine the provision of health care services to the needy.
 

 
 *67
 
 In 1994 the City explored the possibility of transferring the operation of three public hospitals under the auspices of HHC— Coney Island Hospital, Elmhurst Hospital Center and Queens Hospital Center — to private entities. In October 1995, the City, through the New York City Economic Development Corporation, and HHC issued an Offering Memorandum requesting proposals from health care providers for the operation and management of Coney Island Hospital under a long-term sublease of the hospital.
 

 In an effort to obtain broader public review of the privatization plan, the City Council in March 1996 commenced this declaratory judgment action against the Mayor and HHC. The City Council alleged that the privatization of the target hospitals by means of subleases with private entities required City Council approval and was subject to the Uniform Land Use Review Procedure ([ULURP] NY City Charter § 197-c). A second declaratory judgment action, raising the same issues, was commenced in May 1996 by two unincorporated associations whose members live and work in the communities served by Coney Island Hospital and the targeted hospitals in Queens
 
 (see, Campaign To Save Our Pub. Hosps.
 
 —Queens
 
 Coalition v Giuliani,
 
 242 AD2d 518). All parties moved for summary judgment.
 

 While the motions and cross motions were pending, the City and PHS New York, Inc. (PHS-NY), a private entity, executed a letter of intent on June 26, 1996 calling for negotiations to achieve a long-term sublease of the property, plant and equipment of Coney Island Hospital to PHS-NY. A contract for PHS-NY to operate Coney Island Hospital as a community-based, acute care inpatient hospital during the term of the sublease was executed as well.
 

 Following a public hearing, on November 8, 1996 the HHC Board of Directors authorized and approved the sublease of Coney Island Hospital to PHS-NY for an initial term of 99 years, with a renewal option for an additional 99 years. The sublease requires PHS-NY, as the tenant under the proposed sublease of Coney Island Hospital, to make a commitment to HHC, as the landlord, to operate Coney Island Hospital as an acute care inpatient hospital during the term of the sublease and to provide a range of inpatient, outpatient and emergency health care services to the Coney Island community, including indigent members of that community. Thus, the proposed sublease would obligate PHS-NY to provide specified essential health care services “to substantially the same degree” as
 
 *68
 
 Coney Island Hospital currently provides. The sublease further provides that the City and HHC would enter into a separate agreement with PHS-NY in which they would agree not to compete with PHS-NY by operating a hospital within the “catchment area” of Coney Island Hospital.
 

 The sublease also includes several significant terms that would benefit the City and the communities served by the hospital. For example, there is a “charity care” provision in the sublease, providing that for the life of the lease PHS-NY would offer care without regard to ability to pay, up to a level 115% greater than the charity care expense currently carried by Coney Island Hospital.
 
 *
 
 Another provision requires PHS-NY to spend at least $25 million in the first five years of the sublease on capital projects, in addition to assuming all routine maintenance costs. PHS-NY also is obligated to assume the outstanding HHC and City bonds associated with Coney Island Hospital and all liability for using and operating the hospital.
 

 The plaintiffs in both actions amended their complaints to allege that the sublease of Coney Island Hospital constituted an ultra vires act; the motion papers were amended to address this issue. Supreme Court granted summary judgment to plaintiffs and declared that the subleasing of HHC facilities was subject to ULURP, that the sublease required the approval of the Mayor and City Council, and that HHC did not have the statutory authority to sublease Coney Island Hospital. The Appellate Division affirmed, holding that the Coney Island Hospital sublease is not authorized by HHC’s governing statute.
 

 We granted leave from the Appellate Division order of modification in
 
 Campaign
 
 and a stipulation withdrawing certain pending claims in
 
 Council,
 
 treated as a final judgment, to bring up for review the prior Appellate Division order in that case. Concluding that the proposed lease is not authorized by the controlling statute, we now affirm and therefore do not need to consider the remaining issues.
 

 Analysis
 

 Does the Act authorize the proposed sublease of Coney Island Hospital to PHS-NY? We begin with the plain meaning of the
 

 
 *69
 
 words used in the statute
 
 (see, Giuliani v Hevesi,
 
 90 NY2d 27, 39). In giving effect to these words, “the spirit and purpose of the act and the objects to be accomplished must be considered. The legislative intent is the great and controlling principle. Literal meanings of words are not to be adhered to or suffered to ‘defeat the general purpose and manifest policy intended to be promoted’ ”
 
 (People v Ryan,
 
 274 NY 149, 152).
 

 The statute clearly indicates that the municipal hospitals would remain a governmental responsibility and would be operated by HHC as long as HHC remained in existence. In the “[d]eclaration of policy and statement of purposes” (McKinney’s Uncons Laws of NY § 7382), the Legislature declared that the provision of health care and the operation of the City’s health facilities were of “vital and paramount concern.” As indicated above, the Legislature was deeply disturbed by the fact that the City’s health facilities were inadequate and that the administrative system then in place obstructed and impaired the efficient operation of health and medical resources (McKinney’s Uncons Laws of NY § 7382). The Legislature noted:
 

 “It is found, declared and determined that in order to accomplish the purposes herein recited, to provide the needed health and medical services and health facilities, a public benefit corporation * * * should be created to provide such health and medical services and health facilities and to otherwise carry out such purposes; that the creation and operation of the [HHC] * * * is in all respects for the benefit of the people of the state of New York and of the city of New York, and is a state, city and public purpose; and that the exercise by such corporation of the functions, powers and duties as hereinafter provided constitutes the performance of an essential public and governmental function” (McKinney’s Uncons Laws of NY § 7382).
 

 The statute requires HHC and the City to enter into an agreement by July 1, 1970, “whereby the corporation shall operate the hospitals then being operated by the city for the treatment of acute and chronic diseases” (McKinney’s Uncons Laws of NY § 7386 [1] [a]). Coney Island Hospital was among the hospitals that the City leased to HHC “for its corporate purposes, for so long as [HHC] shall be in existence” (McKinney’s Uncons Laws of NY § 7387 [1]). The statutory mandate is manifest and self-evident.
 

 
 *70
 
 The statute’s history is replete with similar expressions of the Legislature’s intent. There is no indication that the Legislature intended to authorize HHC to operate City hospitals only to later transfer that authority to a private entity. For example, the Governor in his Approval Memorandum emphasized that HHC was established to “operate and maintain the [City’s] municipal hospitals” (Governor’s Mem approving L 1969, ch 1016, reprinted in 1969 McKinney’s Session Laws of NY, at 2569). The legislative intent was perhaps best captured in a letter written by Mayor Lindsay: “[I]n establishing a public benefit corporation, the City is not getting out of the hospital business. Rather it is establishing a mechanism to aid it in better managing that business for the benefit not only of the public serviced by the hospitals but the entire City health service system”
 
 (see,
 
 Letter dated May 8, 1969, Bill Jacket, L 1969, ch 1016). This letter indicated that “the health care system will continue to be the City’s responsibility”
 
 (id.).
 

 In urging this Court to reverse the Appellate Division decision, defendants argue that section 5 (6) of the Act (McKinney’s Uncons Laws of NY § 7385 [6]) authorizes HHC to sublease the hospital. This section grants HHC the power to
 

 “dispose of by sale, lease or sublease, real or personal property, including but not limited to a health facility, or any interest therein
 
 for its corporate purposes”
 
 (emphasis added).
 

 Defendants also contend that section 5 (8) of the Act (McKinney’s Uncons Laws of NY § 7385 [8]) authorizes the transfer because it grants HHC the authority
 

 “[t]o provide health and medical services for the public directly or by lease with any person, firm or private or public corporation or association,
 
 through and in the health facilities of the corporation
 
 and to make rules and regulations governing admissions and health and medical services” (emphasis added).
 

 To adopt defendants’ arguments would frustrate the clear and well-defined statutory purposes and legislative intent, and would transfer “the performance of an essential public and governmental function” (McKinney’s Uncons Laws of NY § 7382) to the private sector. To this end the Legislature mandated the City to enter into an agreement with the newly created HHC “whereby [HHC] shall operate the hospitals then being operated by the city for the treatment of acute and
 
 *71
 
 chronic diseases” (McKinney’s Uncons Laws of NY § 7386 [1] [a]).
 

 Both of the sections upon which defendants rely recognize that HHC’s ability to divest itself of its assets or services is limited by HHC’s corporate purpose. To read these sections to permit the wholesale transfer of administrative, operations and management control over Coney Island Hospital to a private for-profit entity would be incongruous with the statutory purpose and intent of the Legislature.
 

 Defendants also contend that this transaction is merely a sublease of Coney Island Hospital, not a wholesale transfer, and should not be viewed as an attempt to privatize the hospital. There are, however, several aspects of the sublease that undercut defendants’ argument. Most notably, the covenant by HHC not to compete in the catchment area surrounding Coney Island Hospital effectively takes HHC out of the hospital business altogether. This provision therefore prevents HHC from doing exactly what it is statutorily obligated to do— operate a public hospital for the benefit of New York City residents living in that area.
 

 We are also troubled by the inherent conflict between HHC’s statutory mission and the profit-maximizing goals of a private, for-profit corporation. This clash of missions precludes the transfer of total operational control over a public hospital to a for-profit entity. A public benefit corporation like HHC is “organized to construct or operate a public improvement wholly or partly within the state, the profits from which inure to the benefit of this or other states, or to the people thereof’ (General Construction Law § 66 [4]). In contrast, a private, for-profit corporation exists to provide maximum economic returns to its shareholders. This inherent conflict between HHC’s public purpose and the goals of a health care institution run by a private, for-profit entity was recognized by experts evaluating the public hospital system more than 30 years ago, and played a significant role in the Legislature’s decision to create a public benefit corporation to run the municipal hospital system
 
 (see,
 
 11th Annual Report of Temp St Commn of Investigation, 1969 NY Legis Doc No. 93, at 101).
 

 Moreover, unlike for-profit corporations, public benefit corporations cannot dissolve themselves. Indeed, there is a glaring absence of a suicide provision in the Act, and section 7385 (6) and (8) cannot be read to allow HHC to divest itself of its assets and property. The only way for HHC to exit the
 
 *72
 
 hospital business is the way it entered: through an act of the Legislature
 
 (see, e.g., City of Rye v Metropolitan Transp. Auth.,
 
 24 NY2d 627, 634;
 
 Matter of Gallagher v Regan,
 
 42 NY2d 230, 234).
 

 Thus, the statutory language, amply buttressed by the legislative history, supports the result reached by both the trial court and the Appellate Division: the proposed transaction is not authorized by the statute. HHC was created to fulfill a critical public mission — the provision of comprehensive, quality health care services to the poor and uninsured residents of the City. Although many of the provisions of the proposed sublease arguably would benefit the City and surrounding communities, and indeed, improve the provision of quality health care to the poor, this must be done within the context of the authorizing Act. Short of action by the Legislature, HHC must continue to fulfill its statutory mission within the confines of its powers and purposes as established by its enabling legislation.
 

 Accordingly, in
 
 Council,
 
 the judgment of Supreme Court appealed from and the order of the Appellate Division brought up for review should be affirmed, with costs. In
 
 Campaign,
 
 the order of the Appellate Division should be affirmed, with costs.
 

 Chief Judge Kaye and Judges Bellacosa, Smith, Levine, Ciparick and Rosenblatt concur.
 

 In
 
 Council of City of N. Y. v Giuliani:
 
 Judgment of Supreme Court appealed from and order of the Appellate Division brought up for review affirmed, with costs to plaintiffs.
 

 In
 
 Campaign To Save Our Pub. Hosps.
 
 — Queens
 
 Coalition v Giuliani:
 
 Order affirmed, with costs to plaintiffs.
 

 *
 

 The purported benefits of this “charity care” provision are hotly contested by plaintiffs. In a comprehensive analysis of the proposed sublease, Comptroller Alan Hevesi concluded that the terms of the sublease protect PHS-NY by limiting its liability and do not guarantee that the hospital will continue to serve indigent patients (see, Hevesi,
 
 Analysis of Fundamental Issues That Have Yet to be Resolved
 
 [Nov. 7, 1996], at 1-2).