OPINION OF THE COURT
Jeffrey K. Oing, J.
Historical Background
Andrew Carnegie completed construction of the Carnegie Hall concert hall in 1891 and built two studio towers above the concert hall several years later. Mr. Carnegie owned the concert hall and studio towers until 1925 when they were sold to real estate developer Robert E. Simon, Jr. Mr. Simon operated the concert hall as a concert performance venue, and operated the studio towers as Mr. Carnegie did, that is, as a means of providing operating income to the concert hall through the renting of the units in the studio towers to commercial, retail, and residential tenants.
In the late 1950s, demolition threatened Carnegie Hall and the studio towers. With their demise imminent, the New York State Legislature responded by enacting chapter 524 of the Laws of 1960 to provide New York City with authorization to acquire Carnegie Hall and the studio towers. The Legislature also created the Carnegie Hall Corporation (CHC) to operate and manage Carnegie Hall and the studio towers. Section 1 of chapter 524 provides, in relevant part:
“There is hereby established The Carnegie Hall Corporation as a not-for-profit corporation with the powers, duration, immunities and obligations under the laws of this state of a not-for-profit corporation organized under the not-for-profit corporation law . . . for the purpose of owning or leasing, and managing and operating Carnegie Hall in the city of New York and adjoining properties located on 56th and 57th streets and 7th avenue, in the borough of Manhattan in such city, as an auditorium and facility for musical concerts, symphonies, recitals and instruction, cultural displays, lectures and exhibits, public assembly and the educational, recreational *492 and incidental residential and commercial purposes and activities for which said hall and properties have heretofore been used . . . and to encourage by scholarship, grant and other means the development of talent in music, drama and related and graphic arts. (L 1960, ch 524, § 1, as amended by L 1988, ch 146, § 1.)
In May 1960, the City purchased Carnegie Hall from Mr. Simon and then entered into a 99-year net lease with CHC. In December 1987, the original net lease was amended and restated. Article 8 of the restated net lease provides that CHC:
“shall use and occupy the Carnegie Hall Premises exclusively as an auditorium and facility for musical concerts, symphonies, recitals and instruction, cultural displays, lectures and exhibits, public assembly and the educational, recreational and incidental residential purposes, stores, parking and theatre activities and all lawful uses for which the Demised Premises have heretofore been used, and uses incidental to any of the foregoing.” (Moving papers, exhibit C.)
Article 10 further provides that without first obtaining consent, CHC may:
“rent to others or license others to use, for periods not exceeding the unexpired term of this Lease, space in . . . those portions of the Carnegie Hall Premises known as the offices, stores, lounge, recital halls and theatre and appurtenant facilities and Studios for the purposes set forth in Article 8 hereof, subject to all the terms, covenants and conditions of this Lease.” (Id.)
In May 2007, CHC’s board approved renovation plans of the studio towers and Carnegie Hall’s backstage areas for a project to create additional space to house CHC’s music education programs (Malenka affidavit ¶ 51).
The Commercial Holdover Proceedings
These 10 commercial holdover proceedings involve the studio towers. Petitioner CHC commenced these proceedings against the following respondent commercial subtenants following the expiration of the subleases on June 30, 2007.
Respondent Carol Niffenegger is a painter who has occupied the artist studio space in the studio towers since 1991.
*493 Respondent tenant Nicole Bigar is a painter and sculptor who has occupied the artist studio space in the studio towers since 1987.
Respondent Philippe Bigar is a screen writer, director, and producer who has operated his movie production company out of a space in the studio towers since 1982.
Respondent Andrew Bergman is a screen writer, director and producer who has operated his movie production company out of a space in the studio towers since 1982.
Respondent Rachelle Dattner is a psychologist and psychoanalyst whose private practice serves the needs of musicians and other performers. Respondent Dattner has operated her practice out of the space in the studio towers since 1987.
Respondent Arden Harriman Mason is a painter who has occupied the artist studio in the studio towers since 1998.
Respondent Stephen Potters is primarily an architect, but also a painter, sculptor and photographer, who has operated an architect firm out of the space in the studio towers since 1974.
Respondent Judson Rosebush Co., Inc. is a multimedia artist, director and producer, who has operated several graphic arts studios out of the space in the studio towers since 1986.
Respondent Jean-Pierre Schmitt is the executive director of the French-American Conservatory of Music, which has operated out of the space in the studio towers since 1990. The French-Amercian Conservatory of Music provides music instruction to students of all ages, levels of experience and nationalities.
Respondent Schmuel Tatz is a physical therapist who specializes in body tuning therapy for musicians and dancers. Respondent Tatz has operated his practice out of the space in the studio towers since 1982.
Respondents Senen Ubina and Joy White Ubina are painters who have occupied artist studio space in the studio towers since 1977.
The basis for these holdover proceedings is petitioner’s claim that the space currently occupied by respondent subtenants is needed for music education, and that CHC’s project is consistent with the Legislature’s intent in creating CHC and the restated net lease with the City (Malenka affidavit 11 54). In order to carry out a renovation project, petitioner seeks to regain possession of these premises located in the studio towers.
On the other hand, respondents take the position that Mr. Carnegie built the studio towers to provide affordable living and *494 working accommodations for artists “in an effort to create a long-lasting symbiotic relationship between Carnegie Hall and the residents of the studio towers” (Boop affirmation ¶ 8). For more than 100 years, a unique community of artists consisting of musicians, painters, actors, photographers, sculptors, dancers, and professionals who serve the arts community has occupied the studio towers (Id. ¶ 9).
The Relief Sought
The motions and cross motions concern the commercial holdover proceedings commenced on July 3, 2007 (motion papers, exhibit F). Given that the arguments raised in the separate motions and cross motions are identical, they are consolidated for disposition.
Respondents separately move, pursuant to CPLR 3212, for an order granting them summary judgment dismissing the petition, or, in the alternative, for leave to conduct discovery.
Petitioner cross-moves, pursuant to CPLR 3211 (b), for an order dismissing respondents’ affirmative defenses, and, pursuant to CPLR 3212, granting it summary judgment and issuing a final judgment of possession and warrant of eviction, and awarding it use and occupancy, attorneys’ fees, and setting the matters down for a hearing to determine those amounts.*
Discussion
Respondents’ Motion
Respondents claim that given the manner in which the Legislature created CHC and the City’s role with respect to CHC’s legal status the City is clearly an integral part of petitioner’s existence. From that standpoint, respondents argue that the City has direct governmental involvement and, as such, is sufficiently “entwined” with the management and operation of the studio towers and Carnegie Hall. Taking that argument to its natural conclusion, respondents assert that by virtue of that relationship CHC is a state actor such that any deprivation of property interest triggers constitutional due process protections requiring notice of the reasons for the eviction. In furtherance of that argument, respondents point to the following facts: *495 * the Legislature amended chapter 524 in February 1962 with chapter 22 whereby the City would remain the title owner of Carnegie Hall and the studio towers;
* the City’s involvement in any renovation project is required by article 9 of the restated net lease which provides that CHC must obtain prior approval from the New York City Commission of Real Estate (Boop affirmation ¶ 42); and
* the City’s capital budget for fiscal years 2007 and 2008 contains a line-item appropriation of over $16 million to CHC for unspecified internal and external renovations (Boop affirmation ¶ 43).
The factors to consider in determining whether the City is significantly involved with CHC’s actions such that CHC should be deemed a state actor triggering constitutional due process implications are:
“the source of the authority for the private action; whether the State is so entwined with the regulation of the private conduct as to constitute State activity; whether there is meaningful State participation in the activity; and whether there has been a delegation of what has traditionally been a State function to a private person” (Sharrock v Dell Buick-Cadillac, 45 NY2d 152, 158 [1978]).
Further, it is not just a matter of city involvement, but “significant [city] involvement,” and satisfaction of one of the criteria may not necessarily lead to a determination of state action (id. [emphasis added]). Notwithstanding the factual truisms put forth by respondents (supra), their argument, while factually and legally significant, has already been determined.
In a Supreme Court action in which respondents were plaintiffs, and CHC and the City were defendants (Astor v Carnegie Hall Corp., 2007 NY Slip Op 33116[U] [Sup Ct, NY County, index No. 110609/07, 2007, Rakower, J.]), respondents asserted in the fifth cause of action the following claim, which is identical to the one raised in these proceedings: “[A]s a result of the creation of Defendant CHC by legislation, and the terms of the lease between Defendant CHC and Defendant City, governmental interests are ‘sufficiently entwined’ with the subject premises so as to trigger constitutional due process protections requiring notice of the reasons for the eviction.” (Cross motion, exhibit C; complaint ¶ 35].)
Supreme Court found that:
“CHC does not get its authority to pursue evictions from City, rather its authority arises from the *496 landlord tenant relationship it created with each individual sub-tenancy. CHC, the sub-lessor, seeks to evict its sub-lessees from certain of the studio towers and City has no role in those actions. CHC, like any other private landlord is governed by the RPAPL. Nor is the role of landlord a traditional State function that has been delegated to CHC. Accordingly, the Court finds that CHC’s actions in regard to the tenants of the studio towers do not demonstrate that the relationship between CHC and City is so entwined that CHC should be deemed a State actor.” (Astor at *6.)
Thus, Supreme Court was clear — CHC’s relationship with the City does not make it a state actor. Under the doctrine of collateral estoppel, respondents are barred from relitigating the issue of whether CHC is a state actor based on its relationship with the City.
Respondents argue, however, that notwithstanding this finding their due process argument in these proceedings is different and “is based on the fact that Petitioner is a state actor — an entity created solely by an act of the New York State Legislature and whose powers and sphere of operation is specifically defined and limited by that Act” (Alterman affirmation ¶ 3). Respondents claim they are not collaterally estopped from asserting a due process defense in the instant holdover proceedings because “[t]he Supreme Court’s analysis of the due process claim in that proceeding is limited to whether or not the City of New York is sufficiently entwined with CHC to trigger Respondents’] procedural due process rights” (mem of law, Oct. 9, 2007, at 8): “Supreme Court’s holding, that ‘CHC’s actions ... do not demonstrate that the relationship between CHC and City is so entwined that CHC should be deemed a state actor,’ . . . does not preclude Respondents] from grounding [their] due process claim on the position that CHC is, itself, a state actor.” (Id. at 8-9.) Thus, in these commercial holdover proceedings, respondents are claiming that CHC is itself a public benefit corporation, and by virtue of that status CHC is a state actor (id. at 9).
Respondents contend that CHC is a public benefit corporation because it was created by the Legislature to “operate a public improvement . . . the profits of which inure to the benefit of this or other states, or to the people thereof" (Council of City of N.Y. v Giuliani, 93 NY2d 60, 71 [1999]). Because CHC is a state actor, its failure to provide respondents with prior notice of the basis for its eviction proceedings beyond expiration of the lease denied respondents their due process rights.
*497 Respondents’ argument — that due process concerns are triggered here because CHC is a public benefit corporation and thus a state actor — is untenable. First, besides their contention that the Legislature created CHC to “operate a public improvement” for New York State (Council of City of N.Y. v Giuliani, 93 NY2d 60, 71 [1999]), respondents provide no support whatsoever for their claim that CHC is a public benefit corporation. Indeed, CHC’s enabling legislation does not define CHC as a public benefit corporation. Under these circumstances, I find that CHC cannot be deemed a public benefit corporation.
Nevertheless, assuming CHC is a public benefit corporation, respondents’ argument that it is a state actor by virtue of that designation must fail. A “public benefit corporation[ ] . . . created by the State for the general purpose of performing functions essentially governmental in nature, [is] not identical to the State or any of its agencies, but rather enjoy[s], for some purposes, an existence separate and apart from the State, its agencies and political subdivisions” (Clark-Fitzpatrick, Inc. v Long Is. R.R. Co., 70 NY2d 382, 386-387 [1987]; John Grace & Co. v State Univ. Constr. Fund, 44 NY2d 84 [1978]). The inquiry becomes whether the public benefit corporation should be treated like the State for the specific purpose at issue (id.). For the following reasons, I find that even if CHC were deemed to be a public benefit corporation it is not a state actor.
As important as Carnegie Hall is to the culture of New York City, CHC was not created in the same vein as other public benefit corporations whereby those entities actually provided essential services of a governmental nature to New York State or its citizens (see Clark-Fitzpatrick, Inc. v Long Is. R.R. Co., supra, 70 NY2d 382 [1987] [LIRR created to provide essential commuter services]; John Grace & Co. v State Univ. Constr. Fund, supra, 44 NY2d 84 [1978] [State University Construction Fund created to administer moneys available for the construction of facilities of the State University of New York]). Subleasing the studio towers to commercial subtenants was not the legislative intent behind CHC’s creation. Indeed, CHC’s creation was spurred by the public outcry to save Carnegie Hall from the wrecking ball.
With that in mind, there can be no cognizable argument that respondents’ commercial subleases are not considered “incidental” to CHC’s purpose of managing Carnegie Hall. Not only were such subleases incidental, they were with CHC and not the City, and respondents have no rights under CHC’s restated *498 net lease with the City. Further, the restated net lease permits CHC to commence summary proceedings and does not require it to first obtain the City’s approval. Respondents’ situation is clearly distinguishable from those cases finding significant and meaningful governmental participation triggering due process guarantees (512 E. 11th St. HDFC v Grimmet, 181 AD2d 488, 489 [1st Dept 1992] [City significantly “entwined” with the conduct of the Housing Development Fund Corporation’s purpose of housing the poor so as to trigger tenant’s due process guarantees]; 157 W. 123rd St. Tenants Assn. v Hickson, 142 Misc 2d 984 [App Term, 1st Dept 1989] [City entwined with conduct of Tenant Interim Lease program triggering tenant’s due process guarantees]).
Respondents’ reliance on Council of City of N.Y. v Giuliani (supra) in support of their contention that CHC is a state actor is misplaced. In that case, the Legislature created the Health and Hospitals Corporation (HHC) to manage and operate the City’s municipal hospital system with a mission to provide efficient comprehensive health and medical resources to protect and promote the safety and welfare of New York City residents (93 NY2d at 66). Further, according to HHC’s enabling Act, the corporation’s functions, powers, and duties “constitute! ] the performance of an essential public and governmental function” (id.). The Court of Appeals found that HHC’s subleasing of a municipal hospital to a private company “would be incongruous with the statutory purpose and intent of the Legislature” (id. at 71).
Here, the Legislature did not establish CHC to perform an “essential public and governmental function,” such as managing a municipal hospital system (Council of City of N.Y., 93 NY2d at 66). CHC’s purpose and mission is clear: “owning or leasing, and managing and operating Carnegie Hall ... as an auditorium and facility for musical concerts, symphonies, recitals and instruction, cultural displays, lectures and exhibits, public assembly and the educational, recreational and incidental residential and commercial purposes and activities.” (Moving papers, exhibit B.) Although respondents may disagree given what is at stake for them, there is a clear difference between HHC’s transfer of its managerial duties over a municipal hospital to a private entity, which unquestionably involves the “performance of an essential public and governmental function,” and CHC’s action of regaining possession and access to the studio towers in order to expand Carnegie Hall’s music programs.
*499 With the curtain about to be lowered, respondents argue that CHC’s commencement of the holdover proceedings is ultra vires of its enabling legislation (L 1960, ch 524). As discussed supra, chapter 524 provides that CHC’s subleasing of commercial space is considered incidental to its purpose of managing and operating Carnegie Hall as an auditorium for, among other things, musical concerts. In addition, article 24 of the restated net lease authorizes CHC to institute and maintain in its own name summary proceedings against subtenants of the studio towers. As such, CHC has not engaged in ultra vires conduct by commencing these holdover proceedings.
Unsuccessful thus far, respondents advance a final argument based in no small part on their musical and artistic contributions to this City. As a part of a community of working artists who depend on the unique architectural features of the studio towers as well as the work and creative energies of their neighbors for inspiration, respondents take the position that they have a cognizable property interest in the continuation of their tenancies (Boop affirmation ¶¶ 46, 47). In that regard, they contend that the Legislature created CHC to manage and operate the studio towers as Andrew Carnegie intended for the building to be used — as work or residential artist studio spaces (Boop affirmation ¶ 50). Respondents claim that CHC’s charter, as reaffirmed in the restated net lease, commits CHC to continue renting space to respondents and other artists (Boop affirmation ¶ 51).
This argument is unavailing. Neither CHC’s enabling legislation nor the restated net lease mandate that CHC make the space available in the studio towers to working artists. Nor do respondents point to any such provision in the enabling legislation or the restated net lease. Likewise, there is nothing in the record committing CHC to continue renting space to respondents or other artists. As far as respondents possessing a cognizable property interest in the continuation of their tenancies, they have not on this present record shown that they can overcome the well established real property principle that “commercial or nonresidential tenants do not have a constitutionally protected property interest which entitles them to continue in possession except for good cause shown, or which precludes eviction proceedings on the sole ground that their leases have expired” (9th & 10th St. v Adopt-A-Building, Inc., 188 Misc 2d 611, 614 [App Term, 1st Dept 2001]).
*500 Petitioner’s Cross Motion
Petitioner cross-moves to dismiss respondents’ affirmative defenses. Respondents’ first and second affirmative defenses allege the following: (1) CHC, a public benefit corporation, derives its interest in the subject premises from its enabling legislation and the terms of its lease with the City, and governmental interests are so intertwined with these proceedings that due process mandates respondents receive notice for the basis of the proceedings beyond expiration of the lease or term of occupancy, and (2) CHC’s commencement of these holdover proceedings is ultra vires of the terms under which the Legislature created it. Based on this court’s analysis supra, CHC’s cross motion is granted and these two affirmative defenses are dismissed.
As for respondents’ third affirmative defense, that the holdover proceedings are ultra vires because they purportedly violate the terms of CHC’s lease with the City, it is also dismissed. First, respondents are collaterally estopped from asserting the defense that article 10 (b) and (c) of the restated net lease obligates petitioner to continue renting to respondent and other artists to maintain the historical mix of residential, artistic and other uses in the studio towers. The court in the Supreme Court action decided this issue based on article 35 of the restated net lease, entitled “No Third Party Beneficiary,” which provides:
“Neither Subtenant nor any other person not a party hereto shall be deemed a beneficiary of this Lease, or shall have any authority or rights to enforce or to require the City to enforce against Tenant any or all of the provisions, terms, conditions, covenants and agreements of this Lease.” (Moving papers, exhibit C.)
Interpreting article 35, Supreme Court found that it left respondents without standing to enforce any of the provisions of the restated net lease. Further, as previously discussed, article 24 of the restated lease permits CHC to commence summary proceedings.
Respondents’ fourth affirmative defense, namely, that petitioner is required to obtain the approval of the Commissioner of Real Estate before beginning renovations of the studio towers, is also dismissed. Respondents fail to point to any provision in CHC’s enabling legislation, the restated net lease, or respondents’ subleases which required petitioner to obtain such *501 approvals for renovations before commencing summary holdover proceedings against respondents.
In their fifth affirmative defense, respondents assert that the proposed renovation project is subject to the requirements of the Uniform Land Use Review Procedure (ULURP) and the New York State and New York City Environmental Quality Review Acts (SEQRA and CEQRA), and contend that CHC has not complied with these environmental requirements. Given the City’s response in the Supreme Court action, namely, that “any ULURP, SEQRA or CEQRA determinations are premature because, at this time, CHC has not proposed any renovation plans that are sufficiently detailed for City to examine or approve” (Astor, 2007 NY Slip Op 33116[U], at *7), and, absent any indication to the contrary, this affirmative defense is premature and dismissed without prejudice to respondents to pursue at an appropriate juncture.
The sixth affirmative defense is dismissed. Respondents assert in the sixth affirmative defense that these holdover proceedings cannot be maintained in the absence of the City, which they argue is an indispensable party. The argument is unavailing. The City is not a party to the subleases between CHC and respondents, and CHC has the authority under the restated net lease to commence summary holdover proceedings against the studio tower subtenants. Thus, other than their assertion, respondents fail to show how the City is an indispensable party to these holdover proceedings.
Accordingly, respondents’ individual motions for summary judgment are denied. That branch of petitioner’s cross motion seeking to dismiss respondents’ six affirmative defenses is granted, and those affirmative defenses are dismissed. That branch of petitioner’s cross motion for summary judgment seeking judgment of possession and warrant of eviction based on the expiration of respondents’ subleases is granted. This court awards petitioner a judgment of possession and a warrant of eviction. A hearing shall be held to determine use and occupancy and attorneys’ fees. This proceeding is hereby restored to the Part 52 calendar for such hearing. The parties are directed to appear in Part 52 on December 17, 2007 at 9:30 a.m.
Notwithstanding these determinations, the facts and circumstances of these proceedings compel this court to make the following observations. Unquestionably, music inspires *502 the soul. Having said that, the parties have entrenched themselves in a litigation posture akin to that of take no prisoners. I cannot help but believe that such an inflexible approach on both sides may engender unforeseen consequences detrimental to them and the public. Perhaps in the spirit of discourse and given what is at stake, both sides will come together to resolve their differences and achieve a mutually agreeable common ground.

 In petitioner’s cross motion against respondents Bigar, Schmitt, Tatz, and Judson Rosebush Co., petitioner seeks to sever and continue its monetary claims for rent arrears. Petitioner, however, does not set forth any arguments in its papers in support of this claim. Thus, this court will not address the merits of those arguments.